**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) )  Chapter 15 |
| Paul Zeital Kemsley, | ) ) )  Case No. 12-13570 (JMP) |
| Debtor. | ) ) |

# MEMORANDUM DECISION DENYING PETITION FOR RECOGNITION OF FOREIGN PROCEEDING

ARENT FOX LLP
*Attorneys for Debtor*
1675 Broadway
New York, NY 10019

> Eugene R. Scheiman, Esq.
> Nicholas P. Pavlidis, Esq.

CLIFFORD CHANCE US LLP
*Attorneys for Barclays Bank PLC*
31 West 52nd Street
New York, NY 10019

> Jeff Butler, Esq.
> Benjamin Peacock, Esq.

ASK LLP
*Attorneys for Mark Fry, as Foreign Representative*
151 West 46th Street, 4th Floor
New York, NY 10038

> Edward E. Neiger, Esq.

JAMES M. PECK
United States Bankruptcy Judge

### *Introduction*

Before the Court is a contested petition for recognition of a London bankruptcy case for

an individual debtor.  This is the first contested matter involving recognition of an individual's

foreign insolvency case to be decided in the Southern District of New York.  The Court needs to

find the locus of the center of main interests for this individual and also to determine whether an

establishment exists in London for this debtor (as that term in defined in Section 1502(2)).

Given the many personal moves of this individual from one home to another during the past few

years, these are not easy questions.

As explained in this decision, Paul Kemsley did not have a center of main interests in the

United Kingdom (the "UK") on the date that he filed his bankruptcy case in London nor did he

have a "place of operations" in the UK for carrying out nontransitory economic activity.  As a

result, the Court denies the petition for recognition of his London bankruptcy proceeding as

either a foreign main proceeding or foreign nonmain proceeding.

### *Preliminary Discussion of Certain Issues Relating to Consideration of Petition for Recognition*

Paul Zeital Kemsley ("Mr. Kemsley" or the "Debtor") is an individual who has been

living in the United States but who also has close personal and business links to London.  He is a

debtor in a personal bankruptcy case that has been pending in London since January 13, 2012

(the "UK Proceeding").  Joint Fact 1.[1]  Mr. Kemsley is a well-known figure in the UK and at one

---

[1] The record is comprised of the following two stipulations: (i) Joint Stipulation of Undisputed Facts, entered
January 29, 2013, ECF No. 18 ("Joint Facts"; references to a single fact from the Joint Facts will be cited as "Joint
Fact __" and references to multiple facts from the Joint Facts will be cited as "Joint Facts __, __"), and (ii)
Stipulation Governing the Admission into Evidence of Certain Documents, dated February 15, 2013, so ordered by

time was a prominent and successful businessman in that market with ties to real estate investing

and professional soccer.  Tr. 110:10-14.  He is eager to regain that former success in the near

term and has stated that he expects to take full advantage of his fresh start once he is granted a

discharge by the High Court in London from burdensome personal debts (measured in the tens of

millions of pounds).  Tr. 17:3-6; Joint Exhibit 9 at 14-15 (Statement of Affairs for UK Debtor's

Petition).

   His bankruptcy trustee, Mark Fry, filed a petition with this Court under chapter 15 of the

Bankruptcy Code on August 21, 2012, seeking an order recognizing the UK Proceeding as a

foreign main or nonmain proceeding.  Barclays Bank PLC ("Barclays"), a major creditor in the

UK Proceeding, has sued the Debtor in state court litigation, both in New York and Florida, and

seeks to recover five million pounds advanced to Mr. Kemsley on an unsecured basis.  Joint

Facts 9, 10.  Barclays actively contests recognition presumably with the objective of avoiding the

consequences of imposition of the automatic stay and retaining control of the state court

litigation.

   Barclays contends that Mr. Kemsley has been living and working in the United States for

an extended period of time and no longer qualifies as a foreign debtor.  In addition to having

lived in the United States continuously for three and a half years, Barclays points to

representations made in the Debtor's UK bankruptcy petition regarding the Debtor's center of

main interests that are in conflict with the position now being advanced by Mr. Fry.

   The essence of the argument against recognition is that Mr. Kemsley left London in 2009

at a time of business reversals in the UK to build a new life in the United States, and since that

---

the Court on February 20, 2013, ECF No. 24 ("Joint Exhibits" ; references to a single exhibit from the Joint Exhibits
will be cited as "Joint Exhibit __" and references to multiple exhibits from the Joint Exhibits will be cited as "Joint
Exhibits __, __"), and Mr. Kemsley's testimony from a January 29, 2013 evidentiary hearing, ECF No. 19; citations
in the form "Tr. __:__" refer to page and line numbers of the transcript.

time has become a full time resident of New York City with the apparent intention of remaining

indefinitely, thereby causing his center of main interests ("COMI") to be relocated from the UK

to the United States.  Barclays also submits that the evidence offered to show an establishment in

the UK is inconclusive and weak and fails to meet the standards of proof for a foreign nonmain

proceeding.  Mr. Fry counters that the Debtor never intended to live indefinitely in the United

States and that his COMI did not move with him when he became a resident of this country.

Rather, it remained in the UK where his bankruptcy is being administered, his children are

residing and he has a meaningful concentration of ongoing personal and business interests.  As a

fallback, the trustee submits that Mr. Kemsley's ability to use a particular spare office in London

during business trips to the UK is sufficient to allow the UK Proceeding to be recognized as a

foreign nonmain proceeding.

　　　　This contest over recognition of an otherwise routine personal bankruptcy case focuses

attention on the legal consequences of the decision made by this high profile (and formerly high

net worth) British citizen to live for a period of time as an expatriate in the United States while

also taking steps in London to obtain a discharge of his debts in the UK.  The question of

possible recognition is complicated by Mr. Kemsley's frequent moves since coming to live here

with his family in 2009.  These moves, coupled with his continuing connections to the UK, make

it difficult to determine where this individual's main interests are centered.  The notion of

habitual residence as that term is used in Section 1516(c) of the Bankruptcy Code is not so

presumptively obvious for someone who seems not to be rooted in any one place and whose

relationships have an international character.

　　　　Additionally, Mr. Kemsley is a bankrupt who does not live like one.  Since leaving his

debts behind and coming to the United States, his financial difficulties have not diminished his

4

high standard of living.  He earns personal income from certain business activities (he has worked for Planet Hollywood and currently represents the iconic Brazilian soccer star Pele through a marketing business with offices in New York known as Legends 10) and rather conveniently also has ready access to abundant free cash (principally in the form of loans or gifts from generous friends) enabling him to live very well.  Tr. 11:20-21, 12:3-17, 64:5-21.

During the past three and a half years, the Debtor has moved around a great deal and has managed to cover a lot of territory.  Initially, he came to the United States with his family in 2009 to reside in a vacation property owned by the Debtor and his wife located in Boca Raton, Florida.  Tr. 23:5-24:1.  After tiring of the quiet pace of Florida, Mr. Kemsley and his family moved on successive occasions to a number of more stimulating venues, first to a spectacular apartment on the 75th floor of the Time Warner Center at Columbus Circle in New York City (leased for the use of the Kemsley family in the name of the New York Cosmos professional soccer team at a staggering monthly rental of $57,500), and then to two different rented private homes in Los Angeles (one in Beverly Hills that he shared with his wife and family and another in nearby West Hollywood where he moved when he and his wife separated).  Tr. 16:13-21, 38:23-40:13; Joint Exhibits 1, 3.

Mr. Kemsley's life in the United States changed in June of last year when his wife left Southern California and returned to London accompanied by their three children.  Tr. 46:7-23. June of 2012, thus, becomes an important date in the Debtor's personal narrative because at that point Mr. Kemsley no longer was living with or in close proximity to his children.  He remained in Los Angeles for a while but ended up returning to New York to live in an apartment in a residential building owned by one of his friends in Manhattan's Tribeca neighborhood.  Tr. 52:20-53:2.  Currently, Mr. Kemsley is occupying a second apartment unit at the same address

leased in the name of his live-in girlfriend and has guaranteed payment of the exceedingly high monthly rent for this unit. He now works in an office building in Times Square where Legends 10 has its offices. Tr. 45:24-46:6, 60:20-61:8. Thus, by all objective criteria, the Debtor is leading the life of a sophisticated New Yorker with international connections.

The long distance moves described above manifest the deliberate personal choice to experience life in different sections of the United States and not to return to the UK. But despite this conscious decision to remain in this country, Mr. Kemsley has testified that he still considers himself to have close ongoing ties to his friends and family in the UK (and most particularly to his three children who now live in London with their mother). Tr. 18:22-19:9. He misses his children and intends to move back to London promptly after he is granted a bankruptcy discharge in the UK Proceeding. Tr. 17:3-6. He has engaged realtors and is now looking for a place to live in London. Tr. 17:12-14. He even thinks that his New York girlfriend may join him in relocating to the UK. Tr. 65:20-66:2.

In evaluating this evidence, it should be noted that the Debtor, with the aid of surrogates, has been providing indirect financial support to Mr. Fry to cover the trustee's legal expenses in pursuing recognition under chapter 15. Joint Exhibit 14 (Email from Mr. Kemsley to Mr. Fry regarding payment of Mr. Fry's legal fees); Tr. 105:19-108:14. This financial support may indicate that the trustee's petition for recognition is an aspect of a coordinated trans-Atlantic litigation strategy orchestrated by Mr. Kemsley and his advisers to shield Debtor's assets from enforcement actions by Barclays (notably his Florida real estate).

The Debtor is defending himself currently in two lawsuits brought by Barclays. Joint Facts 9, 10. Mr. Kemsley recently tried unsuccessfully to obtain injunctive relief from the High

Court to stay that litigation.[2]  The automatic stay that would come into effect upon recognition of the UK Proceeding as a main foreign proceeding would have the same effect as an injunction and would stay the litigation.  Therefore, Mr. Kemsley is not an incidental subject of this cross-border skirmishing but an economically motivated participant who wants the automatic stay for his personal benefit.

The working arrangement between the trustee and Mr. Kemsley is an unlikely one. These are parties who ordinarily would be opposed to each other with respect to claims to recover the Debtor's assets located in the United States for the benefit of UK based creditors. The Debtor and the trustee have formed what amounts to a joint venture – with funding funneled from sources loyal to the Debtor – to achieve a result that is adverse to the interests of one of his major creditors.

Mr. Kemsley's motives here are plain: he wants to block collection remedies by Barclays against him in the United States.  Less obvious is the reason for the trustee's decision to align himself with the Debtor and his apparent reluctance to work with Barclays.  The circumstances are curious in light of assurances given by counsel for Barclays that his client is willing to cooperate with the trustee for the benefit of all creditors that have valid claims in the UK Proceeding and will agree to ratably share any recoveries that may be realized from the Debtor and his assets located in the United States.  For reasons that have not been adequately explained, the trustee has failed to reach an agreement with Barclays regarding such a cooperative approach to creditor remedies.  This adversity between the trustee and Barclays, while worth noting, does not directly relate to the issues before the Court.  Those issues require a weighing of the evidence.

---

[2] In a submission dated March 11, 2013, Barclays advised the Court that Justice Roth of the High Court denied the request for a stay based in part on the unresolved status of the current recognition proceedings.

Deciding whether to recognize Mr. Kemsley's UK bankruptcy case as either a foreign main proceeding or a foreign nonmain proceeding requires consideration of whether the facts support finding COMI for the Debtor in the United States or the UK. In the case of an individual, COMI is presumed to be his or her place of habitual residence. *See* 11 U.S.C. § 1516(c). Habitual residence is not a defined term but has been construed as the place where an individual resides with the intention of remaining for an indefinite period of time. *In re Ran*, 607 F.3d 1017, 1022 (5th Cir. 2010).

In this instance, because of the Debtor's multiple internal moves while living in this country, the presumption in Section 1516(c) may not be helpful in determining the Debtor's habitual residence. One possible conclusion is that the Debtor has no habitual residence within the meaning of the statute. Another is that he has a COMI in the United States that has come into being each time that he and members of his family purposefully moved within this country to a new principal residence. As will be explained further, determining COMI here requires an assessment of the Debtor's personal decisions about where to live, not only for himself but for members of his immediate family. COMI for this father of three also may have changed when his children were no longer living within his immediate orbit.

Habitual residence is a term of art that involves more than an individual's current place of residence. Barclays cites to the dictionary definition of the word habitual (resorted to on a regular basis or commonly used), but that reference ignores case authority and does not convey the secondary meaning that the term implies as used in chapter 15. An executive may have the habit of residing in a particular hotel on regular business trips, but that does not implicate COMI for that individual. Habitual residence is a concept implying more than just the place where an individual happens to be living at a particular time and has aspects of an ongoing intention to

8

stay in the same location for the foreseeable future unless and until something might occur to

prompt or compel a change (loss of employment, family needs, illness, job opportunities,

retirement, other significant life events or perhaps a spontaneous desire to relocate born of a

spirit of adventure).

The term habitual residence includes an element of permanence and stability and is

comparable to domicile; it connotes a meaningful connection to a jurisdiction, a home base

where an individual lives, raises a family, works and has ties to the community.  In short, it is the

place where an individual is living and has manifested the expectation of remaining for an

indefinite period of time.  Barclays suggests that the Debtor's habitual residence became New

York when he moved to the Time Warner Center to become CEO of the New York Cosmos, but

that allegation of habitual residence does not account for the Debtor's later moves to the West

Coast and fails to define COMI at a point in time that is relevant to the date of commencement of

either the UK Proceeding or this chapter 15 case.

A critical factor in determining COMI for an individual is finding the existence of a

habitual residence as of a particular date.  There are two choices: COMI can be determined either

as of the date of commencement of the foreign proceeding or of the related chapter 15 case.  *See,

Ran*, 607 F.3d at 1025 ("Congress's choice to use the present tense requires courts to view the

COMI determination in the present, i.e. at the time the petition for recognition was filed.").  *But

see, In re Gerova Fin. Grp., Ltd.*, 482 B.R. 86, 92-93 (Bankr. S.D.N.Y. 2012); *In re Millennium

Global Credit Master Fund Ltd.*, 458 B.R. 63, 72 (Bankr. S.D.N.Y. 2011) ("The substantive date

for the determination of the COMI issue is at the date of the opening of the foreign proceeding

for which recognition is sought.").

This split of authority on the question of the relevant date for determining COMI (date of commencement of the foreign proceeding or the date of the petition for recognition) is not just a theoretical concern in this instance.  Based on the facts presented, the date chosen for deciding the Debtor's habitual residence turns out to be pivotal in analyzing COMI because of the changes that occurred in Mr. Kemsley's personal life between these two dates.

The Debtor signed his bankruptcy petition in London on January 13, 2012 listing his Boca Raton home address as his residence although at the time that home was occupied by a tenant, and he was residing in a rented home in West Hollywood, California.  His children were living in nearby Beverly Hills with his wife.  That proximity to family was severed in June when his wife decided to leave the United States and returned to London taking the children with her. The trustee's petition for recognition was filed about two months later on August 21, 2012.  As of that date, Mr. Kemsley had relocated his residence to New York, and his children were living an ocean away.

This family break up and related moves, in the Court's view, are significant events for purposes of analyzing COMI for this individual.  Once Mr. Kemsley's children left the United States and moved back to London, Mr. Kemsley's habitual residence in the United States is in conflict with his desire to be with his children.  Based on Mr. Kemsley's own testimony, the Court believes that the most important variable in determining COMI for the Debtor turns out to be not his place of residence, but the residence of his children.

Their return to London is an objective major event in the Debtor's personal life.  Being separated from his family is a circumstance that has affected Mr. Kemsley's sense of commitment to remaining indefinitely in the United States.  The Court accepts the Debtor's testimony and believes that Mr. Kemsley must have felt more comfortably at home in the United

States during the period of his residency while living here with his children.  The Court

concludes that the COMI analysis for this Debtor appropriately should take into consideration

external factors that provide context for his decision to live in one place or another.

Habitual residence for an individual who has a family extends beyond the individual

himself and depends also on the life circumstances of that individual <u>and</u> his family.  Without

doubt, Mr. Kemsley now wants to return to the UK to connect again with his children.  The

question is whether that understandable motivation should be taken into account in determining

COMI for the Debtor.  The answer will depend upon the time frame for deciding where an

individual's interests are deemed to be centered for insolvency purposes.

The Court agrees with Judge Gropper that the date of commencement of a foreign

insolvency proceeding is the proper date for determining COMI for a foreign debtor.  In this

case, that is the date of filing of the petition to commence the UK Proceeding and the date when

the opportunity for cross-border cooperation first came into being[3].  It is a fixed and readily

verifiable date.  In contrast, the date for filing a petition for recognition can vary greatly

depending on circumstances and the diligence of the foreign representative.  When the date of

commencement of the UK Proceeding is used as the date for finding COMI, Mr. Kemsley's

stated desire to return to the UK to be near his children, while doubtless true, is extraneous to the

analysis.

The Debtor has testified that he wants to return to London to see his children and resume

his life there, but for purposes of analyzing COMI, those statements do not relate back to the date

of commencement of the UK Proceeding.  The Court recognizes that Mr. Kemsley is now living

separate and apart from his three children, misses them a great deal and naturally would want to

---

[3] Another possibly relevant date is the date in March, 2012 when Debtor was declared a bankrupt and Mr. Fry was appointed as trustee, but using this date does not change the analysis.

be closer to them in London.  Tr. 10:1-11:19.  This factor alone is a strong incentive for the

Debtor to leave New York and return to the UK in the near term, but his subjective intent to

move back to London expressed from the witness stand at the evidentiary hearing does not help

in deciding whether the Debtor, for purposes of the presumption set forth in Section 1516(c) of

the Bankruptcy Code, had an habitual residence in the United States or the UK when he filed his

bankruptcy petition in January, 2012.

    State of mind of another person is an inference made on the basis of that person's

credible statements and behavior.  Mr. Kemsley's statements from the witness stand regarding

his next move – a return to London after years of living and working in various parts of the

United States – do not illuminate his intentions as of the date that he started the UK Proceeding.

In short, the question of whether Mr. Kemsley would truly prefer to be living with his girlfriend

in his Tribeca apartment or near his children in the UK is a debatable proposition despite the

undoubted sincerity of the Debtor's stated desire to see his children.  Sometimes deeply felt

attractions are in conflict, and such obviously subjective feelings are not the best barometers for

deciding whether a court should be exercising jurisdiction in a chapter 15 case.

    This case illustrates the challenges in applying recognition principles to an individual

whose life is not tied to one place.  The Court concludes based on the evidence that Mr.

Kemsley's life is best characterized as unsettled.  He is an ambitious and self-confident

individual who looks forward to a more stable future when his debts from the past will no longer

burden him and he will be able to concentrate on new business ventures.  However, his moves

from one residence to another on multiple occasions during his self-imposed exile from the UK

make it more difficult to find the one location where his interests are most properly centered for

purposes of international insolvency law.

Two possible conclusions may be reached based on Mr. Kemsley's residential mobility while living in this country. The first is that the Debtor may not have lived in any one house or apartment (or even region of the United States) with the intention of establishing the kind of residential stability contemplated in Section 1516(c).[4] The second is that Mr. Kemsley may have had a series of different habitual residences in the United States that came into existence once he decided to reside in a particular house or apartment for an indefinite period of time. Such a conclusion would depend upon uncertain and debatable inferences as to the subjective views of the Debtor regarding the relative permanence and duration of residency in a particular home.

In this instance, the Court believes that the Debtor's close relationship with his children serves as a useful proxy for the Debtor's subjective intent regarding his habitual place of residence. Judging his various moves from the point of view of his family as a whole, the Debtor appears to have had a number of different habitual residences in the United States starting with his move to Boca Raton[5]. Mr. Kemsley came to the United States in 2009 with his wife and children, moving first to Florida, then New York and finally to Los Angeles. Each of these moves involved consideration of whether the proposed relocation would be in the best interests of his children. Tr. 16:9-17:2, 39:1-12.

These moves are based on separate decisions about where to live, but in combination they reflect an unambiguous decision by the Debtor to live with his family exclusively in the United

---

[4] Barclays introduced various residential leases executed by Mr. Kemsley while he has been living in the United States in support of its argument for denial of recognition. *See* Joint Exhibits 1 (lease for luxury New York City apartment, dated March 8, 2010, with lease term of two years), 3 (lease for house in Los Angeles, dated December 15, 2011, with lease term of one year), 5 (lease for another New York City apartment, dated March 1, 2012, with lease term of one year). However, evidence of such leases is not probative of any actual intent to remain in possession for the stated terms because Mr. Kemsley actually has moved from place to place regardless of the terms stated in these leases and viewed these properties as being so attractive that they could be easily leased to another tenant if he were to move out prior to the stated lease term. For him, the term of the lease was not an important consideration because of his belief that he could break the lease and move out with the expectation that his landlord would have little difficulty in finding a replacement tenant. Tr. 111:13-23.

[5] The first move to Boca Raton might have been considered as temporary were it not for the fact that the family did not return to the UK for years. When viewed retrospectively, the time spent in Boca Raton was the start of an extended stay in this country for the family.

States for an extended period of time. That is sufficient to establish habitual residence. The Court has decided that Mr. Kemsley's interests are centered with his children and that his COMI was in the United States and not in the UK at the opening of the UK Proceeding. It is difficult to state when COMI applicable to the Debtor was transferred from the UK to the United States, but it occurred at some point prior to commencement of the UK Proceeding.

When the Debtor traveled to London to commence the UK Proceeding, his COMI was in the United States where he had been living for years and still resides. Statements made in the bankruptcy petition also confirm that COMI was outside the UK (Joint Exhibit 8) and indicate that the Debtor also understood that he no longer could legitimately claim the UK as his COMI. Importantly, his children had been living with him in the same household (or living near him) throughout the period of his residency in the United States leading up to his decision to file the UK Proceeding.

Regardless of any applicable presumption, the Court finds that Mr. Kemsley, having lived with his family in the United States for a number of years and having sold his home in the UK before his move to Florida, chose to live as an habitual resident in a number of different parts of the country (Boca Raton, New York and Los Angeles). This pattern, while unusual, was sufficient to shift COMI from the UK to the United States. The Debtor was a habitual resident of Los Angeles at the time of commencement of the UK Proceeding because he was living in that community and his children were attending school there. Tr. 40:8-42:12, 57:22-58:4.

The result might be different if COMI were to be tested as of the August filing date of the chapter 15 petition, a date when the Debtor was living in New York and separated from his children who were living in London. The Debtor has testified that he wants to be reunited with his children, a strong indication that he does not feel entirely comfortable living in New York

without them.  However, these changed circumstances of the Debtor's personal life have no

direct bearing on a COMI analysis that properly should be made as of an earlier date.  Life is

fluid, but COMI is a concept that is determined as of a fixed date (commencement of a foreign

insolvency case) based on the circumstances that then existed.  As of the filing date of the UK

Proceeding, Mr. Kemsley's COMI was in the United States, and nothing that has occurred since

then should be considered.

Mr. Fry also has failed to carry his burden to show that the Debtor has an establishment

in the UK for purposes of recognition of the UK Proceeding as a nonmain proceeding.  Debtor's

testimony that, on occasion, he would use a spare office in London belonging to a firm known as

1966 Entertainment does not show the existence of a place of operations in the UK.  *See

generally* Tr. 91:9-96:2.  Having the ability to work sporadically in a friend's office is not the

same as having a regular presence in London and is insufficient to prove the existence of an

establishment.

### *Procedural History*

On January 13, 2012, Mr. Kemsley filed a bankruptcy petition in the UK under the UK's

Insolvency Act of 1986.  Joint Fact 1.  In his Statement of Affairs filed with the UK Proceeding,

Mr. Kemsley listed over thirty-million pounds of unsecured liabilities.  Joint Exhibit 9 at 14-15.

Barclays is listed as an unsecured creditor that is owed five-million pounds on account of a

personal loan.  *Id.* at 14.  Mr. Kemsley was declared a bankrupt pursuant to an order of the High

Court of Justice in England, dated March 26, 2012.  Joint Fact 2.  Shortly thereafter, Mr. Fry was

appointed as one of two trustees in the UK Proceeding.[6]  Joint Fact 3.

---

[6] Kristie Provan is the other trustee in the UK Proceeding.

Barclays brought an action in New York State Supreme Court against Mr. Kemsley on

March 1, 2012 based on a breach of its loan agreement and seeking a money judgment on

account of its claim (the "New York Action").[7]   In part to stay prosecution of the New York

Action, Mr. Fry filed his chapter 15 petition on August 21, 2012 for recognition of the UK

Proceeding as a foreign main proceeding, as that term is defined in Section 1502(4) of the

Bankruptcy Code.  ECF No. 1.

Barclays objected to recognition on October 24, 2012 arguing that the Debtor does not

meet the statutory requirements for recognition because he resides in the United States (and has

stated this in various documents) and has a number of strong current connections to the United

States including his employment and property ownership.  ECF Nos. 10, 11.  Mr. Fry filed a

brief supporting recognition of the chapter 15 petition on December 7, 2012 arguing that the

statutory requirements for recognition as a foreign main proceeding are met because of Mr.

Kemsley's significant ties to the UK, his temporary visa, and the fact that most creditors are

located in the UK.  ECF No. 16.  In the alternative, Mr. Fry has sought recognition of the UK

Proceeding as a foreign nonmain proceeding, as that term is defined in Section 1502(5) of the

Bankruptcy Code, on the basis of an alleged secondary place of employment in the UK.  *Id.*

An initial hearing on the contested petition for recognition took place on December 11,

2012.  At that time, the Court found that the record did not include any direct evidence reflecting

the Debtor's habitual residence and was inadequate to make a determination regarding COMI.

The Court directed a further hearing so that Mr. Kemsley could testify based on his personal

knowledge regarding the disputed facts.  The hearing took place on January 29, 2013 and

---

[7] In addition to the New York Action, Barclays also filed an action in the State of Florida, Circuit Court, Fifteenth
Judicial Circuit, Palm Beach County on November 26, 2012 alleging fraudulent transfers of Mr. Kemsley's
residence in Florida.  Joint Fact 10.

included hours of testimony by Mr. Kemsley, references to exhibits and argument.  On that date, the parties also filed the Joint Facts.  ECF No. 18.  Thereafter, the parties submitted supplemental briefs based on the evidence and a stipulation of Joint Exhibits that was approved on February 20, 2013.  ECF No. 24.

### *Discussion of Legal Standard*

Based on the record established, deciding whether the center of main interests for this Debtor is in the UK or the United States depends primarily on the date chosen for the determination and the weight to be given to Mr. Kemsley's testimony.  While he is no doubt self-interested and has an incentive to support recognition, the Debtor for the most part was a credible witness, and the facts developed during his examination largely are undisputed.  The contest here involves how these facts should be construed in identifying where the Debtor has his habitual residence for purposes of this chapter 15 case.

The question presented (whether the UK Proceeding should be recognized) needs to be evaluated within the framework and objectives of practice under chapter 15 of the Bankruptcy Code.  One notable feature of the analysis is that Mr. Fry, as foreign representative, is the party who filed the petition for recognition in order to obtain the assistance of this Court in his administration of a currently pending bankruptcy case.  His goals are not personal.  Mr. Fry is acting as a fiduciary and seeks recognition presumably because he has concluded that commencement of a chapter 15 case for the Debtor would be beneficial to all creditors in the UK.  The fact that Mr. Fry is acting here in a representative capacity for the collective good of creditors with claims arising under UK law is consistent with the objectives of chapter 15 and is

a factor that favors recognition.  No evidence has been presented to suggest that Mr. Fry has not acted in good faith in petitioning for recognition.[8]

Chapter 15 was enacted to provide effective mechanisms for dealing with cross-border insolvency cases.  11 U.S.C. § 1501(a).  The provisions of chapter 15 incorporate the Model Law on Cross-Border Insolvency and enable an authorized foreign representative to obtain relief from the bankruptcy court in the United States to aid in the administration of a foreign proceeding, including imposition of the automatic stay under Section 362 of the Bankruptcy Code.  11 U.S.C. § 1520(a)(1).

As a prerequisite to relief under chapter 15, the petition must satisfy three requirements for recognition: the proceeding must be a foreign main proceeding or foreign nonmain proceeding within the meaning of Section 1502, the foreign representative must be a person or body, and the petition must meet the requirements of Section 1515.[9] 11 U.S.C. § 1517(a).  The foreign representative, here the trustee, has the burden of proof on the issue of recognition.  *Ran*, 607 F.3d at 1021 (citing *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 334 (S.D.N.Y. 2008)).

Section 1517(b) also provides that a foreign proceeding shall be recognized –

(1) as a foreign main proceeding if it is pending in a country where the debtor has the center of its main interests; or

(2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.

---

[8] The fact that Mr. Kemsley has helped to cover certain expenses of Mr. Fry raises some concern as to appearances but does not rise to the level of a challenge to the trustee's good faith.

[9] Section 1515 of the Bankruptcy Code requires that the application for recognition include certain documents, including a certified copy of the decision commencing the foreign proceeding, a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative, and a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative. 11 U.S.C. § 1515.

11 U.S.C. § 1517(b).  If the requirements of a foreign main proceeding or a foreign nonmain

proceeding are not satisfied, the Court should deny recognition of the chapter 15 petition.  *Bear*

*Stearns*, 389 B.R. at 334 ("If the debtor does not have its center of main interests or at least an

establishment in the country of the foreign proceedings, the bankruptcy court should not grant

recognition and is not authorized to use its power to effectuate the purposes of the foreign

proceeding.").

        The contest over recognition of the Debtor's bankruptcy case focuses on the significance

of the acknowledged fact that Mr. Kemsley has been living in the United States for the past three

and a half years.  Barclays argues that this is an insurmountable disqualification and that the UK

Proceeding does not fit the definition of a foreign main proceeding.  The following sections

confirm that Barclays is correct in asserting that the Debtor's COMI was in the United States as

of the date of commencement of the UK Proceeding.

        *The Date of the Filing of the UK Proceeding is the Most Appropriate Date to Analyze COMI*

        Courts are split on the proper date for analyzing the factors for determining a debtor's

COMI.  The operative dates are either (i) the date of commencement of the foreign insolvency

proceeding (*Gerova*, 482 B.R. at 92-93; *Millennium*, 458 B.R. at 72) or (ii) the date of filing of

the related chapter 15 petition for recognition (*Ran*, 607 F.3d at 1025; *In re Betcorp Ltd.*, 400

B.R. 266, 290-92 (Bankr. D. Nev. 2009)).

        The Fifth Circuit in *Ran* reads Section 1502(4) to speak in the present tense (a foreign

main proceeding is a proceeding pending in the country "where the debtor <u>has</u> the center of its

main interests") and thereby to be indicative of a test to be made as of the date of filing of the

chapter 15 petition, but that reading, in the Court's view, places too much emphasis on an

otherwise neutral verb tense.  *Ran*, 607 F.3d at 1025.  The section is silent regarding the "as of"

date for analyzing COMI and can be properly read to mean the country where a debtor has his, her or its COMI as of the date of opening of the foreign proceeding.  The textual analysis adopted by the Fifth Circuit suggests that the language supports testing for COMI when the chapter 15 petition is filed but does not provide meaningful temporal guidance for using that date.

In contrast to the analysis in *Ran*, *Gerova* and *Millennium* are recent decisions of this Court determining that the COMI analysis should be performed as of the commencement of the foreign insolvency proceeding.  These decisions focus attention on the nature of a chapter 15 case and its purpose in facilitating administration of an insolvency case in a foreign jurisdiction.  As the Court observed, "[i]n a chapter 15 filing, the U.S. case is ancillary or secondary to the foreign proceeding," and the date of the chapter 15 filing "is a matter of happenstance." *Millennium*, 458 B.R. at 72 (citations omitted).

The Court in *Millennium* also commented that using the date of the chapter 15 filing as the operative date for the COMI analysis carries with it an added risk of forum shopping "as it gives *prima facie* recognition to a change of residence between the date of opening proceedings in the foreign nation and the chapter 15 petition date." *Millennium*, 458 B.R. at 75.  Although picking one date for the COMI analysis is necessarily somewhat arbitrary, in this instance it makes good sense to choose the filing date of the UK Proceeding.  It was on that date that Mr. Kemsley made representations as to his COMI and on that date that the UK Proceeding was initiated.  The Court agrees with the reasoning in *Gerova* and *Millennium* and finds that COMI should be judged as of the filing date of the foreign insolvency proceeding.

*Determining COMI for an Individual Debtor*

Demographics attempt to classify and group individuals, but people behave in ways that defy easy classification.  Each life is distinct and is defined by a unique set of experiences and choices.  No one life is quite the same as any other.  This is true for individual choices as to where to live and the state of mind that leads to the decision to remain in one place indefinitely.

There is an element of personal decision making that is embedded in the test for COMI of an individual, and in that sense an objective observer must presume or infer the existence of subjective judgments by the individual debtor in question.  Some people never leave home, while others are globe trotters.  Depending on the facts, determining COMI for an individual can be a routine exercise or, as in the case of Mr. Kemsley, very challenging.  For example, if the Debtor had not moved to the United States and had remained in London before commencing the UK Proceeding, the test would be a simple one and recognition at the request of the trustee would have been easily granted without credible opposition.  His many moves complicate the process.

What makes COMI for an individual particularly difficult in its application is that it includes the above referenced subjective element.  From the Court's perspective, a COMI analysis should not depend upon intentions, whether expressed or unexpressed, but should be based on criteria that are objectively observable.  An individual should not be able to impact a COMI analysis by testimony regarding intended future moves.  To do so, introduces a speculative element in which the individual debtor's stated intentions regarding a proposed move to a new jurisdiction may influence the COMI analysis.  Accordingly, while subjective factors cannot be entirely removed from the analysis, objective criteria are most reliable.

In the context of a corporate debtor, this Court has looked to certain objective factors to determine COMI, including the (i) location of headquarters, (ii) location of management, (iii)

location of primary assets, (iv) location of creditors effected by the case, and (v) jurisdiction

whose law would apply to most disputes. *In re Sphinx, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y

2006). The Bankruptcy Court for the Eastern District of Virginia applied these factors from

*Sphinx* to an individual chapter 15 debtor as follows:

> "[f]actors that are useful in instances where the debtor is an individual include:
> the location of the debtor's primary assets; the location of the majority of the
> debtor's creditors or a majority of the creditors [that] would be affected by the
> case; and the jurisdiction whose law would apply to most disputes."

*In re Loy*, 380 B.R. 154, 162 (Bankr. E.D. Va. 2007) (citing *Sphinx*, 351 B.R. at 117). This is

not necessarily an exhaustive list.

Other observable criteria may be identified depending upon the facts of each case. These

criteria could include, among other things, the jurisdiction where a person lives and works and

may have children enrolled in school, possible club memberships or affiliations with religious

organizations and other recognized ties to the community that are indicative of residential status

and community involvement. The weight to be given to any one of these factors will likely vary

depending upon the relative importance of the factor to the debtor and the debtor's personal

circumstances.

In the contested petition before the Court, two of the factors noted in the above quotation

from *Loy* happen to be consistent with finding COMI in the UK for Mr. Kemsley. Notably, most

of the Debtor's creditors are located in the UK, and it is reasonable to assume that UK law

governs the many obligations that he incurred in the UK. In this instance, however, those factors

are insufficient to outweigh personal connections that are centered in the United States. The

critical factor for Mr. Kemsley, as shown by his testimony, is proximity to his children, and the

Court has looked to Mr. Kemsley's relationship with his children as a significant factor in

determining his COMI.

*The UK Proceeding Is Not a Foreign Main Proceeding*

The concept of habitual residence or domicile is difficult to apply to Mr. Kemsley given his multiple moves while living in the United States.  As noted earlier in this decision, since leaving London in June, 2009, he has resided in Boca Raton, Florida (2009), New York City (Columbus Circle, 2010), Los Angeles, California (Beverly Hills and West Hollywood 2011-12), and once again in New York City (Tribeca, 2012; moving from one unit to another at the same address).  He has been a resident of the United States but not necessarily a habitual resident in any single location.

At the time of commencement of the UK Proceeding, Mr. Kemsley was residing in West Hollywood.  The question thus becomes whether, at the date of commencement of the UK Proceeding, he was living in a place where he intended to remain.  This is not an easy question for a transient individual such as the Debtor.  Nonetheless, the Court has noted one consistent theme that became evident throughout the Debtor's testimony, namely the central role that his family, and his children in particular, play in his life.  The Debtor has parental concerns for the happiness and welfare of his children, and that accounts for his move from Boca Raton to Manhattan in 2010 and for his interest in moving back to the UK now.

The Debtor's habitual residence appears to mirror the movement of his family unit. Since moving to the United States, the Debtor has had three separate habitual residences – Florida, New York, and California.  At the time of the commencement of the UK Proceeding, Mr. Kemsley's habitual residence for purposes of determining his COMI was in California.  At that time, Mr. Kemsley lived in Los Angeles with his family, albeit in separate houses, and his

children attended school in Los Angeles.[10]  Importantly, as of that time period, he had not

expressed any intention to return to the UK.

The Debtor's intent with respect to COMI is further corroborated by statements made in

various filings in the UK Proceeding.  For example, in the petition filed to commence the UK

Proceeding, the Debtor was instructed to delete certain references in the form that were not

applicable.  One of the statements that Mr. Kemsley struck out related to COMI and stated: "[My

centre of main interests is in England and Wales][I have an establishment in England and

Wales.]."  Joint Exhibit 8 at 1.  On the other hand, the Debtor did not strike a statement which

read, "My centre of main interests is not within a Member State."[11]  *Id.*    Further, in the Witness

Statement of Paul Zeital Kemsley, dated January 16, 2012, the Debtor stated that "I have had a

place of residence in England and Wales during the period of three years prior to 13 January

2012 *(although I am now resident in the USA)*."  Joint Exhibit 10 at 2 (emphasis added).

The trustee urges the Court to give weight to the Debtor's stated intention to return to the

UK.  However, his desire to be reunited with his children is of relatively recent vintage.  At the

commencement of the UK Proceeding, Mr. Kemsley's children were residing in Los Angeles,

and it was not until June, 2012 that his wife and children returned to the UK.  Conceivably,

COMI for this particular Debtor may have started to change around the time that he was

separated from his children, but it is not possible to relate that changed circumstance to the date

of commencement of the UK Proceeding.  Mr. Kemsley's COMI did not suddenly change when

---

[10] According to the petition filed in the UK Proceeding, Mr. Kemsley was employed by Planet Hollywood, a company based in Florida, on the petition date.  Joint Exhibit 9 at 18.  The petition also lists a company called Sport 101 PLLC, but Mr. Kemsley testified that he never worked for that company.  Tr. 85:1-10.

[11] Mr. Kemsley tried to explain away these deleted references to COMI by suggesting that the form was prepared by his solicitors without his active involvement.  This is one subject matter where the Court has doubts regarding Mr. Kemsley's credibility.

his children moved away, and even if an argument can be made in support of such a sudden shift in COMI, it occurred after the relevant date for testing COMI.

While the issues here are subtle, there is no question that Mr. Kemsley had no residence in the UK but had multiple places to call home in the United States when he flew to London in January 2012 to commence the UK Proceeding. He was visiting London at that time, and his COMI was then in the United States. Accordingly, Debtor's case in the UK does not meet the definition of a foreign main proceeding.

*The UK Proceeding Does Not Qualify as a Foreign Nonmain Proceeding*

In the alternative, the trustee argues that the UK Proceeding should be recognized as a foreign nonmain proceeding. A foreign nonmain proceeding is "a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment." 11 U.S.C. § 1502(5). An establishment is defined as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2).

Whether an establishment exists is "essentially a factual question, with no presumption in its favor." *Ran*, 607 F.3d at 1026 (citing *Bear Sterns*, 389 B.R. at 338). The "bar is rather high" to prove that a debtor has an establishment. *Id.* at 1026-27 (citing *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 131 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2007)). The Court of Appeals in *Ran*, in the context of an individual debtor, equated establishment as a place where the debtor has "a secondary residence or possibly a place of employment...." *Id.* at 1027. The trustee alleges that Mr. Kemsley's secondary employment with a UK company called 1966 Entertainment ("1966") meets this requirement.

25

The Debtor's employment with 1966 is, however, far too loose an arrangement to meet the statutory requirement for finding of an establishment. 1966 is a company owned and operated by a close friend of the Debtor, Terry Byrne. Mr. Kemsley did not have an employment agreement with 1966 and did not have a regular schedule for using an office in London in the space rented by 1966. Instead, Mr. Kemsley worked on an *ad hoc* basis under what he termed "an informal arrangement between friends." Further, much of the money received from 1966 or Mr. Byrne was in the form of an advance rather than compensation received for actual work performed. Tr. 91:9-96:2.

Given the unspecified and irregular nature of the Debtor's purported employment with 1966 and the lack of evidence supporting periodic use of an office in London that was actually assigned to him for specified purposes of carrying out nontransitory economic activity, the Court finds that the requirements for an establishment are not met. Accordingly, the UK Proceeding also fails to meet the requirements for recognition of a foreign nonmain proceeding.

## Conclusion

Each of us has a unique set of connections to our place of residence, some personal and others institutional, and there are multiple ways for an individual to manifest the intent to remain indefinitely in that place of residence. These factors will vary in intensity and relevance, but when combined and weighted will reveal where a debtor's interests are centered for purposes of chapter 15, although not always with clarity. In determining COMI for an individual foreign debtor, the Court needs to be sensitive to the facts applicable to that individual and to be mindful that factors of primary importance to one person may be secondary or even inconsequential to another. In short, when deciding COMI for an individual for whom the presumption of Section

1516(c) does not readily apply, the Bankruptcy Court must weigh the facts on a case by case basis.

As for Mr. Kemsley, the Court finds that proximity to his children constitutes a determinative factor in finding COMI in the United States on the date of commencement of the UK Proceeding.  That factor may not apply with the same force in other cases involving individuals with different interests.  For the reasons stated, the Court denies the petition for recognition.


SO ORDERED.


Dated: New York, New York
      March 22, 2013

                                *s/ James M. Peck*
                                Honorable James M. Peck
                                United States Bankruptcy Judge